UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 11-10217-RGS

UNITED STATES OF AMERICA

v.

LARRY WILKINS AND RONALD MERRITT

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO VACATE JUDGMENTS

May 8, 2013

STEARNS, D.J.

Defendants Ronald Merritt and Larry Wilkins move to set aside their convictions and vacate their guilty pleas pursuant to Fed. R. Crim. P. 11(d) and 28 U.S.C. § 2255.[1] For the reasons stated below, the respective motions will be denied.

I. FACTUAL BACKGROUND

A. Defendants' Arrests

The facts underlying defendants' guilty pleas are largely undisputed. On April 23, 2011, an undercover Boston Police officer posing as a drug buyer approached Merritt near the intersection of Washington Street and East Berkeley and asked where

---

[1] Merritt separately filed a Motion to Stay Sentence or Otherwise Release Defendant From Custody pending a ruling on his motion to vacate his guilty plea. Because Merritt's motion to vacate will be denied, his request for release under 18 U.S.C. § 3143 is moot.

the "stacks" were.[2]  Merritt responded by asking the undercover officer if he "needed something," to which the officer replied that he "had 40."  Merritt told the officer to follow him down Washington Street towards Traveler Street.  As they walked, Merritt asked the officer for the money and was handed $40.  When they reached the Traveler Street intersection, Merritt began to cross, telling the officer that he was going to "get the stuff from my boy."  The officer demanded that Merritt give him something as collateral for his $40.  Merritt handed the officer his cell phone.

Merritt then crossed Washington Street and met with Wilkins and a female (later identified as Audrey Velez).  The three walked south to a vacant lot where Merritt and Wilkins engaged in an exchange.  Merritt then returned to the intersection and instructed the officer to follow him.  As they walked back towards Traveler Street, Merritt handed the officer a plastic bag containing a white granular substance.  The officer returned Merritt's cell phone and asked if he could have Merritt's phone number.  Merritt asked for and dialed the officer's cell phone number, which rang displaying Merritt's own phone number.  Immediately thereafter Merritt was arrested and found to be in possession of a second small bag of what appeared to be crack cocaine.  Merritt stated that he had purchased it from "the white guy I [was] just with"

---

[2] The "stacks" is a street term for a public gathering spot frequented by drug dealers and their customers.

(referring to the undercover officer).

Officers also approached Wilkins and Velez who were sitting at the MBTA Silver Line stop on East Berkeley Street. They placed Wilkins under arrest. Wilkins was holding a napkin containing five bags of a white substance, as well as the $40 in buy money that the undercover officer had given to Merritt. While Wilkins was being transported to the police station for booking, a transport officer heard noises coming from the rear of the van. When the van reached the station, Wilkins (the only occupant) was taken out. Officers found thirty bags of a white substance on the floor. A field test of one of the bags proved positive for cocaine base. Wilkins later admitted that the thirty packages were his. Another bag containing a white substance was found stuck to the sole of Wilkins's right shoe during the booking process.

B. Annie Dookhan

Annie Dookhan worked as a chemist at the Department of Public Health (DPH) Drug Laboratory in Jamaica Plain, Massachusetts, from 2003 until her resignation in March of 2012. In June of 2011, Dookhan was cited for a breach of laboratory protocol when she removed ninety drug samples from the laboratory's evidence room without authorization. The DPH Director of Laboratory Services reported the incident by letter to the Norfolk District Attorney in February of 2012. A copy of the letter was forwarded in March to the Assistant U.S. Attorney overseeing the federal prosecution

of Merritt and Wilkins.  The letter explained the incident, but stated that there was no reason to believe that the integrity of the samples in question had been compromised. The letter did not mention any other alleged misconduct on Dookhan's part.

After a subsequent DPH investigation exposed a pattern of lapses and irregularities, Dookhan was indicted in December by the Commonwealth of Massachusetts for obstruction of justice, tampering with evidence, and perjury.  She has since pleaded not guilty to charges pending in six county courts.  In a statement to investigators, Dookhan admitted to breaching laboratory protocol; rigging test results (including the deliberate contamination of negative samples with a known drug from a completed test); and "dry-labbing," that is, falsely certifying that she had tested drug samples when she had, in fact, only given them a visual examination.

C. DPH Drug Certifications

1. Initial Testing

The drugs seized from Merritt and Wilkins were tested at the Jamaica Plain laboratory on May 24, 2011.  Dookhan certified that the drugs purchased or taken from Merritt and Wilkins had tested positive for cocaine base (crack cocaine).  She further certified that the bag Merritt had sold to the undercover officer weighed .11 grams, while the bag found on his person weighed .10 grams.  Of the thirty-six bags found on Wilkins, five were ostensibly tested.  Dookhan certified that the bag seized from

4

Wilkins's shoe weighed .11 grams.  The five bags found on Wilkins's person at the scene, she estimated to weigh .50 grams (based on an extrapolation from the one bag that she claimed to have actually weighed).  The thirty bags that Wilkins had discarded in the transport van she estimated to weigh an aggregate of 3.59 grams.

2. Retesting

After the instant motions to vacate were filed, the government commissioned additional drug testing of the items seized at defendants' arrests.  The substitute chemist randomly selected and tested thirteen of the untested thirty-one bags attributed to Wilkins (ten found on the floor of the police van and three taken from his hand at the time of the arrest).[3]  Two bags were inspected with an Ultraviolet (UV) Spectrometer and tested positive for cocaine.[4]  Six bags were tested using the Fourier transform infrared spectroscopy technique (which is capable of distinguishing between cocaine base and cocaine hydrochloride).  All of these samples tested positive for

---

[3] The drugs had been retrieved from the Boston Police Department Drug Depository – where they had been stored after testing at the Jamaica Plain Laboratory – and delivered to the State Police Crime Laboratory in Sudbury, Massachusetts, for analysis.  The drugs were contained in heat sealed bags within a folder marked with the police incident number, the names of the defendants and the date of the arrest, and bar-coded stickers identifying each exhibit separately.  The chemist performing the retesting stated that the packaging of the bags she was given appeared uniform and to have never been opened.

[4] The UV Spectrometer does not distinguish between cocaine hydrochloride and cocaine base.

cocaine base.   Finally, nine of the thirteen bags were tested with a Gas Chromatograph-Mass Spectrometer.  All tested positive for the presence of cocaine and various adulterants.[5]  The twenty-seven previously unweighed bags located in the transport van weighed 2.99 grams, while the four previously unweighed bags seized from Wilkins's palm weighed .42 grams.

## II. PROCEDURAL BACKGROUND

A. Guilty Pleas

Merritt and Wilkins pled guilty to possessing crack cocaine with intent to distribute and distributing crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Wilkins's plea took place in January of 2012; Merritt's in June of 2012.  In each of the separate  Rule 11 hearings, this court explained that to obtain a conviction at trial the government would have to prove beyond a reasonable doubt that the defendant knowingly possessed and distributed what is familiarly known as "crack" cocaine.  In both hearings, the government recited essentially the same facts set out earlier in this decision, including the repeated assertion that the substances found in defendants' possession and sold to the undercover agent were crack cocaine.  When asked directly by the court, Merritt and Wilkins both stated that the government's recitation of the

---

[5] The Gas Chromatograph-Mass Spectrometer also does not distinguish between cocaine hydrochloride and cocaine base.

facts was accurate and that they were guilty of the offense charged.  At no point did either Merritt or Wilkins contend that the drugs found in their possession were not crack cocaine, nor did they dispute the government's recitation of the relevant events. The court accepted both pleas, specifically finding that each defendant fully understood his rights and the consequences of waiving those rights.  The court also found an overwhelming basis in the facts presented by the government to warrant a finding of guilt beyond a reasonable doubt.

B. Sentencing

Merritt's pre-sentence report (PSR) determined that his base offense level was 12 under the advisory Sentencing Guidelines.[6]  Wilkins's PSR determined that his base offense level was 16.[7]  However, the PSRs also found that Merritt and Wilkins were subject to enhanced sentences as career offenders under U.S.S.G. § 4B1.1, based on

---

[6] The base offense level is determined by the Drug Quantity Table found at U.S.S.G. § 2D1.1(c).  The PSR held Merritt responsible for the drugs that figured in the controlled buy and the bag of crack cocaine he had in his pocket at the time of his arrest.  The weight of these drugs totaled .21 grams.

[7] The PSR held Wilkins responsible for the drugs that figured in the controlled buy, the bags of crack cocaine found on his person at the time of his arrest and booking, and the bags recovered from the police transport van.  The weight of these drugs totaled 4.31 grams.

their prior felony convictions for drug offenses and crimes of violence.[8]  Because of the career offender classification, Merritt's and Wilkins's offense level (32) was keyed to the offense statutory maximum, in this case twenty years.  *See* § 4B1.1(b).  The offense level of 32 was in turn reduced by three levels for acceptance of responsibility, resulting in a total offense level of 29 and a mandatory criminal history category classification of VI.  The resulting advisory sentencing guidelines range was 151 to 188 months.  Wilkins was sentenced by the court in July of 2012 to 102 months in prison; Merritt was sentenced in September of 2012 to 84 months in prison.  Prior to his sentencing, Merritt reserved his right to withdraw his guilty plea in light of the burgeoning scandal involving Dookhan.

### III. STANDARDS GOVERNING THE MOTIONS TO VACATE

Under Fed. R. Crim. P. 11, a defendant may withdraw his guilty plea after it is accepted by the court, but before a sentence is imposed, if he "can show a fair and just reason for requesting the withdrawal."  *Id*. at (d)(2)(B).  "There is no absolute right to withdraw a guilty plea prior to sentencing."  *United States v. Marrero-Rivera*, 124 F.3d 342, 347 (1st Cir. 1997).  Relevant factors in determining whether there is a "fair and

---

[8] Merritt's PSR calculated his criminal history points at 26, placing him in Category VI.  Wilkins's PSR determined he had a criminal history score of 12, placing him initially in Category V. *But see* U.S.S.G. § 4B1.1(b) ("A career offender's criminal history category in every case under this subsection shall be Category VI.").

just" reason for withdrawal include whether the plea was voluntary and intelligent, whether there has been a serious claim of actual innocence, the plausibility and weight of the asserted reasons for withdrawal, and any prejudice accruing to the government should the defendant be allowed to withdraw his plea. *See id.*; *United States v. Padilla-Galarza*, 351 F.3d 594, 597 (1st Cir. 2003). The most important consideration is "whether the plea was voluntary, intelligent and knowing, within the meaning of Rule 11." *Marrero-Rivera*, 124 F.3d at 347.

Wilkins, unlike Merritt, was sentenced before the extent of Dookhan's alleged misconduct became known. He thus did not seek to reserve his rights or postpone the sentencing. Because his conviction as a result is final, he may vacate his plea only by direct appeal or collateral attack under 28 U.S.C. § 2255. *See* Fed. R. Crim. P. 11(e). Section 2255 offers post-conviction relief where a defect in a petitioner's sentencing rises to a constitutional magnitude. *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998). A defendant seeking to withdraw his plea after sentencing must "show that the plea proceedings were marred by a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Carrington*, 96 F.3d 1, 5 (1st Cir. 1996) (internal quotations and citation omitted).

Merritt and Wilkins both allege that their guilty pleas were obtained in violation

of their right to due process and without the effective assistance of counsel.  Because these contentions, if merited, would warrant withdrawal of a guilty plea under either Rule 11 or section 2255, the distinction in procedural posture between Wilkins's case and Merritt's has no real bearing on the outcome.  Therefore, the same legal analysis will be applied to both defendants.

## IV. DISCUSSION

Merritt and Wilkins seek to vacate their guilty pleas on Fifth and Sixth Amendment grounds.  Their initial contention rests on the assertion that the pleas were procured in violation of the Due Process Clause of the Fifth Amendment because of the government's failure to disclose the full range of Dookhan's malfeasance.  Defendants assert that this information, if provided, would have cast a shadow over the evidentiary value of Dookhan's certifications of the nature and weight of the drugs that they were accused of possessing.  According to defendants, their attorneys' imperfect knowledge of this potential weakness in the government's case tainted the advice to plead guilty, thereby depriving defendants of their Sixth Amendment right to effective assistance of counsel and rendering their pleas involuntary.

A. Due Process

    1. *Brady v. Maryland*

The suppression by the government "of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The *Brady* rule extends to evidence that has an exculpatory value solely because of its tendency to impeach the credibility of a government witness. *See United States v. Bagley*, 473 U.S. 667, 676 (1985); *see also Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).[9] *Brady* and *Bagley* are however – and the limitation is crucial – trial and not structural rules. "*Bagley's* touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *cf. Weatherford v. Bursey*, 429 U.S. 545, 559

---

[9] While no case in the First Circuit specifically addresses the federal government's exculpatory duty with respect to impeaching evidence involving a state-employed witness like Dookhan, the safer course is to assume that the duty attaches. *See Junta v. Thompson*, 615 F.3d 67, 74 n.5 (1st Cir. 2010) (assuming without deciding that a state medical examiner falls within the *Brady* purview, but noting that the issue is unsettled); c*f. Kyles*, 514 U.S. at 437 (a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").

(1977) (*Brady* did not create any "general constitutional right to discovery in a criminal case").

The practical import of this limitation directly impacts the government's duty of disclosure in a plea bargaining context.   "[T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."   *United States v. Ruiz*, 536 U.S. 622, 633 (2002).  Although the holding in *Ruiz* does not dilute the requirement that a guilty plea be voluntary to satisfy constitutional standards, the Court specified that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware')."   *Id.* (emphasis and alteration in original).  Instead, "the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances – even though the defendant may not know the *specific detailed* consequences of invoking it."   *Id.* (emphasis in original); *see also United States v. Mathur*, 624 F.3d 498, 507 (1st Cir. 2010) ("*Ruiz* teaches that *Brady* does not protect against the possible prejudice that may ensue from the loss of an opportunity to plea-bargain with complete knowledge of all relevant facts.  This makes good sense: when a defendant chooses to admit his guilt, *Brady* concerns subside.").

Here, neither Merritt nor Wilkins makes a claim of actual innocence.  Thus, any impeaching material regarding Dookhan's mishandling of the evidence in theirs or other cases would only be relevant at trial to the extent that it might be used to challenge the chain of custody of the drugs at issue, or possibly to impeach the efforts of the substitute chemist to repair the damage done by Dookhan.  Neither of these purposes, as *Ruiz* makes clear, has any relevance to the validity of defendants' guilty pleas.  *See Ruiz*, 536 U.S. at 630 (the Constitution "does not require complete knowledge of the relevant circumstances but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor"); *Ferrara v. United States*, 456 F.3d 278, 291 (1st Cir. 2006) ("Even if a defendant's misapprehension of the strength of the government's case induces him to throw in the towel, that misapprehension, standing alone, cannot form the basis for a finding of involuntariness.").  In sum, the rule of *Brady v. Maryland* offers defendants no relief.

2. *Brady v. United States*

Defendants may have a more plausible argument for vacating their guilty pleas under *Brady v. United States*, 397 U.S. 742 (1970).  This *Brady* decision (not to be confused with *Brady v. Maryland*), requires that a defendant's guilty plea be voluntary in order to satisfy the Fifth Amendment's Due Process Clause.  The First Circuit

13

recognizes *Brady v. Maryland* and *Brady v. United States* as separate and independent

formulations of the right to due process. *See Ferrara*, 456 F.3d at 289 ("While the

district court based its judgment on two constitutional rules – one emanating from

*Brady v. Maryland* and the other from *Brady v. United States* – we conclude the latter

rule, by itself, resolves these appeals."). Of particular relevance is the First Circuit's

discussion in *Ferrara* of the *Brady* rules.

> Let us be perfectly clear: due process does not normally require the
> prosecution either to turn over the whole of its file or to disclose every
> shred of information that might conceivably affect the defendant's
> decisionmaking . . . . Under limited circumstances, however – everything
> depends on context – the prosecution's failure to disclose evidence may
> be sufficiently outrageous to constitute the sort of impermissible conduct
> that is needed to ground a challenge to the validity of a guilty plea. *See*
> *Bouthot*, 878 F.2d at 1511 (stating that a defendant could attack his plea
> under *Brady v. United States* by showing that the prosecution's failure to
> provide information constituted a "material omission tantamount to a
> misrepresentation"); *see also Matthew v. Johnson*, 201 F.3d 353, 364
> n.15 (5th Cir. 2000) (suggesting that, "[e]ven if the nondisclosure is not
> a *Brady [v. Maryland]* violation," there may be situations in which the
> prosecution's failure to disclose evidence makes it "impossible for [a
> defendant] to enter a knowing and intelligent plea").

*Id.* at 291 (alterations in original).

*Ferrara* defines a two-pronged test that is to be used in determining whether a

guilty plea is involuntary. To satisfy the test, a defendant must show that: (1) "some

egregiously impermissible conduct (say, threats, blatant misrepresentations, or

untoward blandishments by government agents) antedated the entry of his plea" and (2)

that "the misconduct influenced his decision to plead guilty, or, put another way, that it was material to that choice." *Id.* at 290. In *Ferrara*, the First Circuit found the requisite egregious government misconduct where the prosecution suppressed a key murder witness's recantation and coerced the witness (who feared losing his immunity and with it physical protection from a notorious crime family) into reverting to testimony falsely implicating the defendant in a murder. "Since the jury's verdict may well have hinged on its evaluation of [the witness's] credibility . . . , the evidence was of enormous significance for impeachment purposes." *Id.* at 292. "In addition, the evidence tended to negate the petitioner's guilt . . . . Since these admissions, if accepted as true, would have precluded a jury from holding the petitioner liable for the [charged] murder, *the suppressed evidence was suggestive of the petitioner's factual innocence*." *Id.* (emphasis added). This "grim picture of blatant misconduct" made the case "one of those rare instances in which the government's failure to turn over evidence constitutes sufficiently parlous behavior to satisfy the misconduct prong of the involuntariness test." *Id.* at 291, 293.

It takes no leap of imagination to recognize that the government's "suppression" of impeachment evidence concerning Dookhan (the scope of which it could not have been aware of at the time of the pleas) falls miles short of the "rare instance" of sufficiently egregious misconduct inducing involuntariness of the kind that figured in

*Ferrara*.  The only impeachment evidence available to the prosecutor at the time of

Merritt's guilty plea (Wilkins had already pleaded guilty) was a letter from the DPH

Director of Laboratory Services describing a breach of protocol committed by Dookhan

in an unrelated case that did not affect the integrity of the drug samples involved.  Here,

there was overwhelming evidence (including defendants' own admissions in the course

of the drug deal) that the contraband carried and dealt by Merritt and Wilkins was in

fact crack cocaine and indeed, defendants do not claim otherwise.  Consequently,

nothing implicates the crux of the first prong of the *Ferrara* exception – coercive

misconduct that compromises a defendant's claim of *factual innocence*.  *See Menna

v. New York*, 423 U.S. 61, 62 n.2 (1975) ("In most cases, factual guilt is a sufficient

basis for the State's imposition of punishment.  A guilty plea, therefore, simply renders

irrelevant those constitutional violations not logically inconsistent with the valid

establishment of factual guilt and which do not stand in the way of conviction if factual

guilt is validly established.").

Moreover, Wilkins and Merritt cannot make the showing of prejudice required

to satisfy the second prong of *Ferrara*.  To demonstrate prejudice, a petitioner must

show "a reasonable probability that, but for [the misconduct], he would not have

pleaded guilty and would have insisted on going to trial."  *Ferrara*, 456 F.3d at 294

(alteration in original), quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  "[A]

reasonable probability is a probability sufficient to undermine confidence in a belief that the petitioner would have entered a plea." *Ferrara*, 456 F.3d at 294.  In considering this claim, a court must determine "whether a reasonable defendant standing in the petitioner's shoes would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession." *Id.*  Relevant factors include:

> (i) whether the sequestered evidence would have detracted from the factual basis used to support the plea; (ii) whether the sequestered evidence could have been used to impeach a witness whose credibility may have been outcome-determinative; (iii) whether the sequestered evidence was cumulative of other evidence already in the defendant's possession; (iv) whether the sequestered evidence would have influenced counsel's recommendation as to the desirability of accepting a particular plea bargain; and (v) whether the value of the sequestered evidence was outweighed by the benefits of entering into the plea agreement.

*Id.* (internal citations omitted).

The court does not dismiss the representations of experienced defense counsel who state that they would not have advised their clients to plead guilty (or might have delayed giving such advice) had they known the extent of Dookhan's misconduct. Relying on its own experience, however, the court does not believe that there is a reasonable probability that either defendant would have forgone a guilty plea (whatever counsel's advice) and taken his chances before a jury in light of the strength of the government's evidence.  Dookhan's mishandling of drug tests in other cases did not

impugn the factual basis that supported the court's acceptance of the guilty pleas.  In addition to the independent retesting of samples of the drugs seized from Merritt and Wilkins,[10] there was overwhelming circumstantial evidence, again including defendants' own admissions, that they knowingly possessed and sold crack cocaine.[11] Moreover, this is not a case where the weight of the drugs seized affected the issue of the degree of guilt or the severity of the punishment as both Merritt and Wilkins qualified as career offenders because of their prior convictions.  In sum, in light of the sheer weight of the untainted incriminating evidence and the appreciable benefit that defendants received in terms of the ultimate sentences for which their pleas made them eligible, both Merritt and Wilkins had strong incentives to plead guilty.  Moreover, these incentives had nothing to do with the (then unknown) impact that information about Dookhan might have had on the jury, even assuming its admissibility.[12]  Rather,

---

[10] The government has strong evidence that Dookhan tested only random samples of the drugs seized from Merritt and Wilkins and that the balance remained untouched in the original sealed evidence bags.

[11] The speculation that defendants might have been engaged in the sham street sale of counterfeit drugs is barely within the rim of the remotely possible.  While episodic sales of counterfeit drugs are not unknown, at a street level, where sales are repetitive and customers are demanding about the quality of what they purchase, any sale of a sham drug is extremely dangerous to an established dealer.

[12] A letter advising a government prosecutor of a chemist's breach of protocol in an unrelated case was found not to have rendered defendant's plea involuntary in *Ritchey v. Johnson*, 95 F.3d 49 (5th Cir. 1996) (denying defendant's habeas petition

they had everything to do with defendants' own self-interest in avoiding almost certain conviction by a jury and subsequent sentencing as career offenders.

B. Ineffective Assistance of Counsel

Although Merritt and Wilkins maintain that their Sixth Amendment ineffective assistance claim is independent of their due process and involuntariness arguments, the claims in fact are symbiotic. The core of defendants' Sixth Amendment claim is the argument that because counsel were not provided with the information impeaching Dookhan, they were unable to accurately assess the strength of the government's case and thus give informed and effective assistance in advising on the wisdom of whether or not to plead guilty.[13]   There is, however, a fatal crack in the foundation of defendants' premise: it follows that if a defendant does not have a constitutional right

─────────────────────

alleging constitutional error where a serologist had falsified samples in other cases given that defendant had "not shown how any such evidence could have implicated the voluntariness of his plea"); *see also United States v. Olsen*, 704 F.3d 1172, 1184-1185 (9th Cir. 2013) (finding no *Brady v. Maryland* violation where the prosecution did not inform defendant that a forensic scientist who handled evidence and testified as to the chain of custody had been the subject of a state investigation for contamination of samples and perjury because there was no reasonable probability that the verdict would have been different had the evidence been disclosed to the jury).

[13] Although Wilkins states that his ineffective assistance claim is not based on a misapprehension of the government's case, his own brief demonstrates that this is not accurate. *See* Wilkins Supp. Mem. at 12 ("[Wilkins's] claim is that, through no fault of his, he was deprived of the information necessary to be properly, adequately and effectively informed and advised prior to deciding to waive his constitutional trial rights and change his plea to guilty.").

of access to impeachment information during pre-trial plea bargaining, his counsel cannot be ineffective for advising him to plead without knowing of that information. To hold to the contrary would fly in the face of the Supreme Court's holding in *Ruiz,* something that his court is neither empowered nor inclined to do, especially in a case like this one where no claim of actual innocence is asserted – only a claim that with more perfect knowledge of the government's hand, defendants might have made better use of their bargaining chips.[14]

---

[14] The result is the same under a conventional *Strickland* analysis. To be entitled to withdraw a guilty plea on grounds that counsel gave constitutionally inept advice, a defendant must show that: (1) counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 58-59. Counsel's conduct, however, is evaluated "from counsel's perspective *at the time*." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (emphasis added). "It is only where, *given the facts known at the time*, counsel's choice was so patently unreasonable that no competent attorney would have made it, that the ineffective assistance prong is satisfied." *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (internal quotations and citation omitted) (emphasis added).

## IV. ORDER

For the foregoing reasons, defendants' motions to set aside their convictions

and vacate their guilty pleas are <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE